II. SUGGESTION

NAME OF SUGGESTER (Primary Contact - complete only if your name may be used)
TRACY C KISSLER

ORGANIZATION AND AUTOVON PHONE NO
1002 CES/DEEP 560-2388

DATE RECEIVED (To be filled in by Program Mgr)
20 AUG 1990

BASE SUGGESTION OFFICE (Include office symbol, location & AUTOVON) (To be filled in by Program Mgr)

SEPARATE DOCUMENT NO. (If any)

SUBJECT OF SUGGESTION
GPS SHOULD BE USED FOR SURVEYING BASES

SUGGESTION NO. (To be filled in by Program Mgr)
PETE 900570

AFTER-THE-FACT SUGGESTION? ☐ YES ☒ NO (If "YES", explain in text of suggestion. Provide information such as person contacted, date contacted, results of contact, etc.)

PRESENT METHOD (Describe completely, continue on bond if necessary)

CURRENTLY THE CONVENTIONAL SURVEYING METHODS USED FOR BASE COMPREHENSIVE PLANS AND OTHER REASONS, ARE BEING USED. THIS PRACTICE COSTS ABOUT $1,000. PER POINT AND IS TIME CONSUMING AND ALSO HAS AN ACCURACY OF ABOUT THIRD ORDER.

PROPOSED METHOD (Describe completely, continue on bond if necessary)

USING THE GLOBAL POSITIONING SYSTEM COSTS LESS MONEY OR ABOUT TWO-THIRDS LESS THAN THE CONVENTIONAL METHOD. SURVEYING CAN BE ACCOMPLISHED IN ABOUT ONE-TENTH OF THE TIME. THE ACCURACY OF BETTER THAN FIRST ORDER CAN BE ACHIEVED.

DESCRIBE EXPECTED BENEFITS

IF THIS PROGRAM WOULD BE IMPLEMENTED DOD WIDE, THE FEDERAL GOV'T WOULD SAVE MILLIONS OF DOLLARS ANNUALLY.

5

ATCH 1

11 March 2003

Ms. Lisa Q. Carlson
800 Micro Court, #712
Roseville, CA 95678
(916) 780-0983
lqcarlson@accessbee.com

Mr. Tracy C. Kissler
1520 Chestnut Springs
Bulverde, TX 78163

Dear Mr. Kissler:

Enclosed is the talking paper that you requested that analyzes the U. S. Air Force's evaluation of your suggestion to the Air Force Suggestion Program back in August of 1990 (FAL 90-0570). You submitted a suggestion that the Air Force and the Department of Defense begin utilizing the Global Positioning System (GPS) satellite constellation for surveying purposes. The enclosed paper describes the innumerable applications of GPS technology in the airspace and range arenas that the Air Force did not consider while they evaluated your suggestion throughout the 1990's.

Please do not hesitate to contact me should you require further clarification on any information in the enclosed paper. It has been a pleasure doing business with you.

Sincerely,

Lisa Q. Carlson

Lisa Q. Carlson

enclosures

**Potential Applications**

**of GPS Within DOD**

**1.** In April and again in August of 1990 Mr. Tracy C. Kissler (Suggestor), 50 CES/CECB, Falcon AFB, CO, submitted a suggestion through the Air Force Suggestion Program that the Air Force and the Department of Defense (DoD) begin utilizing the Global Positioning System (GPS) satellite constellation for surveying purposes (FAL 90-0570). On 22 July 1998 the Suggestor received a letter from Brig Gen Lawrence F. Sheehan, HQ USAF/ILE, stating that the General had determined.. "that there are no further intangible benefits and/or tangible savings attributed during the evaluation period (1 October 1993 through 30 September 1994) which would have resulted from the Air Force-wide adoption of your (the Suggestor's) suggestion". The AF Suggestion Program typically evaluates a suggestion within six months and renders a decision to the suggestor. A decision on this Suggestor's evaluation dragged on for over eight years (Refer to Attachment A, correspondence received by the Suggestor from Air Force personnel between 1991 and 1997, regarding ongoing delays in evaluating his suggestion).

Perhaps Brig Gen Sheehan was not aware of two major Legislative Environmental Impact Statements (LEISs) that were being prepared by HQ/AETC and HQ/ACC during that evaluation period (1 October 1993 through 30 September 1994)? Public Law 99-606 (Military Lands Withdrawal Act of 1986) mandated the preparation of draft EISs for the renewal of the 2.7 million-acre Barry M. Goldwater Air Force Range (BMGR) in southwest Arizona and the renewal of the 3.1 million-acre Nellis Air Force Range (NAFR) in southwest Nevada by 6 November 1998. Otherwise, their use by the military would expire on 6 November 2001. The Air Force began preparation of both of these documents in mid-1994, and the draft LEISs were released for public comment in September 1998. HQ/AETC and HQ/ACC spent nearly 60 million dollars to prepare both of these documents.

**2.** These two fighter pilot combat training ranges are vital national security assets that are used by all branches of the military. The need for training that realistically approximates the way that tactical aircrews are required to fight in actual combat is an unquestionable lesson from the history of aerial warfare. During the short, but intense, air campaign of the Gulf War in January 1991, the United States lost no aircraft in air-to-air engagements, and very few to enemy surface-to-air fire. Notably 50 percent of the F-16, 100 percent of the F-15E, most of the other F-15, and 100 percent of the A-10 crews that fought in the Persian Gulf were trained on BMGR as student pilots. Most of the F/A-18 and AV-8 aircrews from the Navy and Marine Corps had also trained on BMGR. The Sonoran Desert's dry, sunny weather is conducive to year-round fighter pilot combat training, and also accommodates numerous "snow bird" squadrons from bases that experience inclement weather during the winter months *(Renewal of the Barry M. Goldwater Range*

*Land Withdrawal Draft Legislative Environmental Impact Statement*, U.S. Department of the Air Force, September 1998). The large expanse of uninhabited open space, the varied terrain, and their proximity to Luke Air Force Base (AFB) outside of Phoenix, Arizona, and Nellis AFB outside of Las Vegas, Nevada (which saves funding on costly fighter jet fuel costs, a significant benefit when one considers the low capacity of fighter jet fuel tanks) renders both ranges vital national security assets.

> *"Training is everything to us. If we can train to the point where we know our aircraft, our weapons, and our tactics inside out, then we can beat anybody. But, we have to be able to train in the aircraft in an environment that is as realistic as possible to us. We have to be able to train the way that we expect to fight. Otherwise, we will fail in combat. It's just that simple".*
>
> Capt Tom Abbot, U.S. Air Force, F-16 pilot and Persian Gulf War Veteran, interview in *Training America's Airpower*, Luke AFB, Arizona, 1996.

3. The Air Force faced the costly task of surveying millions of acres at both of these ranges. Aerial photography is costly and unreliable. Industry standard expects an average of three percent "stretch" with each aerial photograph, and the earth's curvature becomes an additional factor when surveying several million acres of land. GPS was widely used in preparing both of these congressionally mandated LEISs.

Four other Department of Defense (DOD) military reservations were also subject to renewal of their authorized land withdrawal under Public Law 99-606:

- Bravo-20 bombing range in Nevada (Navy)
- McGregor Range in New Mexico (Army)
- Fort Greely Maneuver Area / Fort Greely Air Drop Area in Alaska (Army)
- Fort Wainwright Maneuver Area in Alaska (Army)

Compliance with the Military Lands Withdrawal Act of 1986 is only one example of GPS usage in DOD during the early 1990's. Currently the Navy, Air Force and Air National Guard are beginning to survey all of their military training routes (MTRs) in compliance with the U.S. Fish and Wildlife Service's Endangered Species Act. MTRs are low-altitude, high-speed navigational routes at airspeeds in excess of 250 knots. GPS will be used to pinpoint the location of endangered species and their nests / roosting areas on hundreds of thousands of statute linear miles of MTRs.

The Air Force alone has 174,000 statute linear miles of MTRs. Each MTR has some-where between one, to over ten, segments per route. Since most MTRs are visual routes, turning points are typically identified by geographic or man made landmarks. Each turning point is listed in the Federal Aviation Administration's "Flight Information Publication Manual" (FLIP Manual), which is updated every four weeks.

GPS would be an obvious application to accurately pinpoint MTR turning segments. Not just for the Air Force's 174,000 statute linear miles of MTRs, but for Navy and Air National Guard MTRs as well.

**4.** On 26 December 1984 the Air Force adopted Regulation 86-4, *Base Comprehensive Planning*. Section C, Page 8, Paragraph 18 states: "The entire Base Comprehensive Plan is to be reviewed and revised as appropriate every five years to incorporate all amendments approved in the intervening period." This Air Force Regulation was in effect when the Suggestor submitted his original GPS suggestion back in April 1990. At that time Base Comprehensive Plans included map tabs, which were developed from photogrametrics. DOD has stewardship of over 43 million acres of land. If one takes a six square-mile area of land (a Township and Range Section), it would require 60-to-1000 survey points, depending on the terrain, to survey the Section. The more varied the terrain, the more survey points would be required. Surveyors locate points and set targets for aerial photography. A conventional survey would take five weeks and would have cost approximately $1,000 per survey point (In 1990 dollars, when the Suggestor originally submitted his suggestion). Furthermore, clear weather, low winds, and high-visibility flying weather are required to perform an aerial survey. Therefore, in 1990 the cost to survey a six square-mile are of land would have cost between $60,000-to-$100,000, and the accuracy would be questionable (Attachment B, memorandum from HQ AFMC/XPMS signed by Chief of the Productivity Branch, Directorate of Plans, to HQ AFSPC/XPMP dated 6 July 1995).

Attachment B, the above-referenced memorandum, also identified intangible benefits as "moderate" and "broad". No intangible benefits were addressed. The Evaluator appeared to focus their determination on installation planning and engineering requirements, without taking into consideration the myriad of range and MTR applications of GPS technology throughout DOD.

**5.** The use of GPS to survey the same Section (six square miles) of land would take approximately nine days at a unit cost of $660 per survey point. This would total between $40,000 to $60,000 in 1990. A cost savings of 33-40 percent over conventional survey methods. Furthermore, the accuracy would be within three meters for each survey point (industry standard for GPS units). In 1990 the Air Force alone had 100 installations. Hypothetically, if each installation averaged six square miles (most bases are considerably larger than this), and the savings by using GPS to survey the base was $35,000 per base – the Air Force alone would have saved $750,000 per year, or $3.5 million in tangible benefits over a five-year period. This cost saving excludes Navy, Air National Guard, and other branches of DOD. Attachment C shows the acreage of DOD ranges in North America alone, and excludes all MTR routes and foreign installations.

**6.** Both of the Air Force Range Renewal LEISs began preparation in early 1994, well after the Suggestor submitted his original suggestion back in April 1990. GPS was used to survey the location of:

- Cultural resource sites

X 10

- Traditional cultural properties
- Mineral resources and abandoned mines
- Threatened and endangered species occurrences
- Active nests and roosting sites of threatened and endangered species
- Hazardous materials and wastes sites
- Unexploded live ordnance for removal by explosive detonation specialists
- Debris at live and inert target locations

GPS was also used to calculate the percentage of ordnance that hit specific ground targets, as well as measuring the surface impact area around specific targets. This enabled the Air Force to calculate the maximum ground disturbance area of large ranges. These single-digit percentages helped the Air Force demonstrate their responsible stewardship of our nation's uninhabited lands to regulatory resource agencies.

**7.** During public scoping meetings for the BMGR LEIS on the Tohono O'odham Indian Nation in southwest Arizona in February of 1996, the Air Force was vociferously criticized for noise impacts that their overflights caused the Nation. Rather than risk the threat of having to cease performing super sonic maneuvers in the Sells Military Operations Area (MOA) over the Tohono O'odham Nation, Airspace Management at Luke AFB took a proactive stance and realigned the most offensive MTRs to reduce noise impacts (*Draft Environmental Assessment for the Proposed Realignment of Visual Route (VR)-223, VR-239, VR-244, VR-259, VR-260 and VR-263, 56th Fighter Wing, Range Management Office, Luke AFB,* August 1997). While surveying the proposed route realignments in a Cessna with Luke AFB Airspace Management for visual geographic or man made turning point landmarks, Luke AFB Environmental Flight used a GPS unit to pinpoint the exact location of turning points for each new segment of the proposed route realignments.

**8.** Other branches of DOD (i.e., the Air National Guard and the Navy) have hundreds of thousands of statute linear miles of MTRs that routinely require survey or realignment. When conducting bi-annual surveys of MTRs (standard industry practice) to locate any new potential route obstructions (such as cellular transmission towers, 250 kilovolt or 500 kilovolt transmission line towers, or new residences along a low-level route), they can be pinpointed to within three meters of accuracy with a GPS unit.

As stated above, the Air Force alone has 174,000 statute linear miles of MTR routes. Hypothetically, an average MTR would be 125 statute miles in length. This would yield 1,392 Air Force MTRs throughout the continental United States. An average MTR could have six segments, which would include six turning points. Per the equation used in Point # 4, each turning point on an MTR would cost approximately $660 per survey point

using a GPS unit (In 1990 dollars, when the Suggestor originally submitted his suggestion). Therefore, to survey all segments of Air Force MTRs using GPS, it would cost $5,512,320 in 1990 dollars. This excludes all other DOD branches that operate MTRs (i.e., the Navy and the Air National Guard).

**9.** GPS technology can be widely employed throughout all branches of DOD to save survey dollars. In the Air Force alone, all weapons delivery (air-to-ground) fighter bases have MTRs. Likewise, all AETC T-38 / T-37 training bases have MTRs. All bomber bases have some MTRs. In the event that a pilot ejects from the aircraft, since 1993 all combat ready fighter aircraft have carried Garmon GPS-12 units in the pilot's survival kit to locate the pilot as expeditiously as possible. Given the millions of acres of open space that comprise the larger western ranges, GPS provides extremely beneficial technology. Rather than deploy rescue crews to search hundreds or thousands of acres for a downed pilot, GPS technology saves thousands of dollars in futile rescue efforts. Furthermore, should the downed pilot require medical attention, the sooner that he / she is located, the better chance they have of continuing their flying service. DOD spends hundreds of thousands of dollars to train each pilot, so it benefits them to lengthen a pilot's flying career as long as possible. This would hold true for Air National Guard, Air Force Reserve, Navy, Marine and Army aircrews as well. Likewise, the site surrounding a downed aircraft requires extensive clean-up efforts on the ground, which would also be expedited by using GPS technology.

**10.** As stated above, DOD has stewardship of 43 million acres of land that should be surveyed every five years. If DOD surveyed one-fifth of their land holdings each year, 8,600,000 acres, it would cost approximately $2,069,329,363 per year using conventional aerial photography survey methods (Using the methodology presented on Page 2, paragraph 2, above). The Air Force alone would save approximately 35 percent each year by using GPS technology, or $724,265,277, versus using conventional aerial photography methods. This does not include survey costs at Air Force Reserve, Air National Guard, Army, Navy or Marine military reservations. Given inclement weather and low visibility at many of the large ranges in Alaska, such as the Brooks Range and the Alaska Range, they are not well-suited for aerial photography survey methods.

**11.** Attachment D is the 1 July 1991 Engineering Technical Letter prepared by the U.S. Army Corps of Engineers that outlined the various uses of GPS for hydrographic survey and dredge positioning activities. Attachment E, dated 4 January 1995 is a memorandum from HCS/MOS at Brooks AFB to HQ/AFCEE/DGP that outlines the contradictory nature in which the Suggestor's original suggestion was evaluated (See 1a, 1c and 1d). Attachment F is AF Form 1000-1, dated 28 September 1995, prepared by HQ/ADCEE/DGP that approves the Suggestor's April 1990 suggestion, concludes that it has "moderate" benefits, but that it also has a "broad" extent of application. Attachment G is the Suggestor's rebuttal to the analysis in the above-referenced Form 1000-1, dated 28 September 1995.

**12.** It appears that the various evaluations of suggestion FAL 90-0570 between April 1990 and July 1998, failed to consider the myriad of cost-saving benefits that GPS

technology provides throughout DOD, particularly in the airspace / range arena. The Evaluators failed to address the airspace / range uses of GPS technology that are outlined above. GPS applications far transcend an AF Base Comprehensive Plan.

** Ms. Carlson has over 15 years experience managing the preparation of NEPA documents and writing environmental analyses. She worked for the Air Force from July 1994 until she separated in January 1999. From March 1998 until January 1999 Ms. Carlson served as a charter member of the HQ/USAF/ILEVP "Tiger Team" for airspace and range issues. From July 1994 until she was promoted to HQ/AFCEE/EC in December 1996, Ms. Carlson served as the NEPA Manager at Luke AFB. She was the original Project Manager for the *Renewal of the Barry M. Goldwater Range Land Withdrawal Draft Legislative Environmental Impact Statement (EIS)*. She also managed the preparation of environmental assessments (EA) to widen and realign four of Luke AFB's MTRs, to create a new MTR for a LANTIRN instrument check pattern, and to extend the supersonic speed waiver in the Gladden / Bagdad MOA in Northern Arizona. She was the original Project Manager on an EA to realign six Air Force and Air National Guard MTR's in the Sells MOA, over the Tohono O'odham Nation in mid 1996. Ms. Carlson utilized GPS technology to support the environmental analyses in all of the above-referenced documents. Ms. Carlson currently works for a private environmental consulting firm. Recently she was Assistant Project Manager on a Supplemental EIS to introduce two new launch vehicles at Vandenberg AFB in California and at Cape Canaveral Air Station in Florida.

DEPARTMENT OF THE AIR FORCE
Headquarters US Air Force
Washington DC 20330-5000

AF REGULATION 900-4

23 July 1987

**Awards, Ceremonies, and Honors**

# THE AIR FORCE SUGGESTION PROGRAM

This regulation states policies and procedures that govern the award programs for suggestions, inventions, patents, and scientific achievements submitted by Air Force personnel (military and civilian). It applies to members of the US Air Force Reserve and Air National Guard. It does not apply to Air National Guard Title 32 military members or National Guard technicians employed under Title 32 United States Codes (U.S.C.) 709. It tells how to apply the program to non-US-citizen employees. It implements DOD Directive 5120.15, 13 August 1985, and DOD Instruction 5120.16, 15 July 1974. The authorities to collect the data described in this directive are under Title 5, U.S.C., chapters 45 and 54; Title 10, U.S.C., Section 1124; Federal Personnel Manual (FPM), chapter 451, and Executive Order (EO) 9397, 22 November 1943.

This regulation is affected by the Privacy Act of 1974. The authorities to collect the data described in this directive are shown above. The requester will show, and on request give, the affected individual a Privacy Act Statement for each form, format, or form letter used to collect personal data before asking for the information.

Do not use this regulation as the basis for changing the type and kind of manpower requirements or authorizations.

Do not supplement this regulation or develop local forms without prior approval of Headquarters Air Force Management Engineering Agency (HQ AFMEA), Directorate of Programs, Suggestion Program Division (HQ AFMEA/MERS), Randolph AFB TX 78150-6431.

| | Paragraph | Page |
|---|---|---|
| Chapter 1—General Information | | |
| Program Policy | 1-1 | 5 |
| Why the Program Is Essential | 1-2 | 5 |
| Who Is Eligible To Participate? | 1-3 | 5 |
| Who Is Not Eligible To Participate? | 1-4 | 6 |
| Program Responsibility | 1-5 | 6 |
| Suggestion Program Data System (SPDS) | 1-6 | 7 |
| Contingency Processing | 1-7 | 8 |
| Chapter 2—Program Promotion | | |
| Promoting the Air Force Suggestion Program | 2-1 | 9 |
| Responsibilities of Management | 2-2 | 9 |
| Funding and Sources for Promotional Items | 2-3 | 9 |
| Chapter 3—Instructions for Suggesters | | |
| What Kind of Suggestions May Be Eligible? | 3-1 | 11 |
| What Kind of Suggestions Are Ineligible? | 3-2 | 11 |
| Group Suggestions | 3-3 | 13 |
| Confirmatory Suggestions (After-the-Fact) | 3-4 | 13 |

Supersedes AFR 900-4, 30 May 1985. (See signature page for summary of changes.)
No. of Printed Pages: 64
OPR: HQ AFMEA/MERS (Mrs Shirley Wade)
Approved by: HQ USAF/PRM (Col Billy E. Deames)
Writer-Editor: D. Britford
Distribution: F; X

## Chapter 1

## GENERAL INFORMATION

**1-1. Program Policy.** The Air Force Suggestion Program recognizes and rewards individuals whose suggestions, inventions, patents, and scientific achievements improve the efficiency, economy, and effectiveness of Air Force, Department of Defense (DOD), and federal government operations. Participation must be voluntary and evaluations prompt. Recognition for resulting improvements and benefits may be a cash award, a noncash award, or an honorary award. The Air Force Suggestion Program, when clearly endorsed as a voluntary program with vigorous support at all levels on a continuing basis, contributes significantly to improving government productivity and services. All eligible suggestions submitted are evaluated. A suggestion may be adopted even if the suggester is not eligible for a cash award. It is administered as a total force program, not a military or a civilian suggestion program. Under this program, awards are based on the merits of the contribution and the benefits that accrue without regard to race, color, religion, sex, marital status, national origin, physical handicap, age, political affiliation, or union membership affiliation or participation. Recognition has a genuine and positive effect in continuing employees' contributions that provide productivity excellence. This regulation outlines the rules and procedures of the Air Force Suggestion Program and how it will be managed. See terms explained in attachment 1. It takes precedence over all other directives in determining eligibility of a suggestion. The three basic steps for managing the program are:

a. The suggester voluntarily submits an eligible idea on AF Form 1000, Suggestion, in response to the terms of the Air Force Suggestion Program. The suggester understands the suggestion must be his or her own idea, and the idea must be complete. The suggestion must describe a valid problem or change (a "before" and "after" explanation) and a solution which should be a detailed description of how to change the current practice and what Air Force or US Government benefits would result.

b. Air Force management is committed to accept an eligible, valid suggestion, and management must give the suggestion proper consideration by a timely, complete, and fair evaluation.

c. After adequate consideration and if the suggestion is adopted and put to use, the suggester is considered for recognition for the implemented ideas. The suggester understands the Air Force has the right to not adopt an idea after appropriate evaluation in which management's evaluator should fully explain reasons for disapproval.

**1-2. Why the Program is Essential.** The objectives of the Air Force Suggestion Program are to:

a. Motivate personnel to suggest practical ways to increase effectiveness and efficiency in the Air Force, DOD, and other federal government operations.

b. Improve morale by providing an opportunity for members and employees to voluntarily take part in the management of the Air Force.

c. Provide a formal channel for communications between management and personnel.

d. Provide an organized method for employees to submit constructive ideas.

e. Foster and maintain an atmosphere that invites participation, cooperation, imagination, creativity, and innovation.

f. Provide evaluation that is unbiased, consistent, prompt, and efficient.

g. Promptly and equitably recognize all eligible persons who improve government operations.

**1-3. Who Is Eligible To Participate?**

a. Air Force military and civilian personnel paid from appropriated funds. Also eligible are Air Force Academy cadets, Reserve Officer Training Corps (ROTC) cadets, Air Force Reserve personnel (including active reservists not on active duty), and Senior Executive Service (SES) personnel. To prevent double entitlements, dual-status technicians (members of the Reserve) take part as civilians under Title 5 U.S.C.

b. Members of any DOD component or federal agency attached to an Air Force installation.

c. Retired military and civilian personnel. If their suggestion was made before they retired, they are eligible for a cash award. If not, they are only eligible for an honorary award.

d. Non-US-citizen, direct-hire employees, when a program has been established by the

installation commander. Installation commanders are authorized to administer suggestion programs compatible with local laws, customs, practices, governing treaties, and executive agreements. Programs are flexible because the customs of the countries vary. Adjust the amounts of authorized cash awards to conform with conditions of the local economy.

e. Indirect-hire, non-US-citizen employees who are employed under agreements with foreign governments and are:

(1) In fact employees of a foreign government or of an agent of that government.

(2) Assigned to the United States forces on a reimbursable cost basis. A program may be established by agreements with foreign governments.

f. Foreign exchange members. They may take part but are only eligible for honorary awards.

**1-4. Who Is Not Eligible To Participate?** Personnel not included in paragraph 1-3 (that is, private citizens, nonappropriated fund personnel, contractor personnel, separated personnel, National Guard technicians employed under Title 32, U.S.C. 709, and Air National Guard (ANG) Title 32 military members).

a. National Guard technicians employed under Title 32, U.S.C. 709 and ANG Title 32 military members participate in the Suggestion Program under regulations prescribed by the National Guard Bureau.

b. The program for nonappropriated fund employees who suggest improvements that result in nonappropriated funds savings is in AFR 40-7.

c. Send suggestions from private citizens, contractor personnel, nonappropriated fund employees (for suggestions not covered in paragraph 1-4b) and all others who are ineligible to participate in the Air Force Suggestion Program under this regulation to the office of primary responsibility (OPR) for evaluation or adoption (or disapproval.) The OPR will reply directly to the suggester. If the idea is adopted, the OPR will send a signed AF Form 1413, Award Certificate, with the reply, giving honorary, noncash recognition to the suggester.

**1-5. Program Responsibility.** The Secretary of the Air Force has further delegated authority for Air Force-wide program administration to the Chief of Staff (CC). The Deputy Chief of Staff (DCS), Programs and Resources, has general supervisory responsibility for the suggestion program. This responsibility is exercised through the Director, Manpower and Organization. Functional responsibilities are as follows:

**a. HQ AFMEA:**

(1) Sets policy and procedures, promotes and publicizes the program, and provides planning guidance.

(2) Performs program oversight and evaluation. Analyzes program activities that may include but are not limited to statistical data, trends, and number of suggestions pending evaluation and overdue at all levels.

(3) Provides feedback information about participation to major commands (MAJCOM) and the Air Staff.

(4) Ensures suggestion policy is uniformly applied.

(5) Maintains liaison with Air Force installations, MAJCOMs, separate operating agencies (SOA), direct reporting units (DRU), the Office of Personnel Management (OPM), and the Office of the Assistant Secretary of Defense (Force Management and Personnel) regarding awards for military and civilian personnel.

(6) Serves as executive secretary to the Air Force Incentive Awards Board which approves awards above the amounts delegated to MAJCOM, SOA, and DRU commanders.

(7) Refers Air Force-originated suggestions through suggestion program channels for any required evaluation by a non-DOD agency and processes non-DOD suggestions requiring an Air Force evaluation.

(8) Orchestrates suggestion program interface with other Air Force programs such as zero-overpricing; fraud, waste, and abuse; technical order system; Productivity Enhancing Capital Investment (PECI); Model Installation Program (MIP); and others designed to induce productivity or cost savings.

**b. MAJCOM, SOA, and DRU Commanders:**

(1) Manage and direct the suggestion program within their commands. They may delegate this responsibility to a deputy chief of staff, normally Plans and Programs.

(2) Assist commanders' management efforts by providing information depicting the general status of their installation's program (see paragraph 4-1b.)

(3) Institute and encourage open communication from suggesters or suggestion program personnel and give the opportunity to expose unnecessary delays or problems within the program.

b. When the base supply price monitor receives a challenge without an AF Form 1000, he or she encourages the challenger to complete the form to be considered for an award by the suggestion office.

c. AF Form 162 need not be completed because the zero-overpricing case file already contains necessary documentation from responsible officials.

**5-6. Model Installation Program (MIP) and Logistics Excellence Program (LEP) Suggestions:**

a. An approved MIP or LEP proposal may be considered for an award under confirmatory suggestion procedures (see paragraph 3-4).

b. AF Form 162 is needed for LEP approvals and command or Air Force-wide implementation of an MIP.

c. If implementation is delayed for a test, an AF Form 162 will be required at the conclusion of the test period. This is because of the length of time that is involved.

d. Any suggestion award authorized under this regulation is limited to the installation where the original MIP or LEP proposal is approved for a test. Piggybacking of the proposal by other bases will not be cause to evaluate for an additional award. However, should the proposal be implemented command-, Air Force-, or DOD-wide, the suggester will be eligible for the appropriate award based on the criteria in chapter 9.

e. The suggester retains ownership of an idea during the time it is being tested under the auspices of the MIP or LEP and for 1 year after final action (date testing is discontinued or date of Air Force- or DOD-wide implementation).

**5-7. Reconsiderations or Reevaluations:**

a. Any office in the evaluation channel may request further review when a higher level evaluator has misinterpreted, overlooked something, or been vague in the first review. The office sends a copy of the request to the base suggestion program office. These reevaluations are initiated by, but not limited to, evaluators, SPMs, or quality control representatives.

b. A reconsideration may be requested by a suggester when he or she can provide sufficient justification to change the original evaluation.

c. If a SPM refers a suggester's request for reconsideration (see paragraph 3-9), the office one level above the previous office (within the same OPR function) who made the final decision and signed the AF Form 162 will do the reevaluation. There should be a new evaluator and responsible official signing the evaluation in response to the reconsideration request. If there is a second request for reconsideration, it is referred to the next higher level (major command or HQ USAF OPR) for adjudication. Exception: The original evaluator may sign the reevaluation if the initial decision is reversed.

d. When the implementing OPR has disapproved a suggestion but later reexamines and implements the idea within the suggester's 1-year "ownership," the OPR completes an evaluation and credits the suggestion. If the OPR acted because of directives from higher authority, the suggestion cannot be credited, but the suggester is advised why.

e. When a previous disapproval of a suggestion is reversed within the "ownership" period, the evaluator or responsible official must make sure the former suggestion is credited even if there is no formal request.

17